IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

SAM M. SIMNS,

    Plaintiff,

v.                                                                                 No. 11-1052
                                                                                 12-1016
                                                                                 12-2026

MAXIM HEALTHCARE SERVICES, INC.,

    Defendant.

---

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT

---

*INTRODUCTION*

The Plaintiff, Sam M. Simns, initially brought this action *pro se* on March 3, 2011 against the Defendant, Maxim Healthcare Services, Inc. ("Maxim"), alleging violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Case No. 11-1052). Simns subsequently retained counsel who, on her behalf, sued the Defendant in the Circuit Court for Madison County, Tennessee under the Tennessee Human Rights Act, Tennessee Code Annotated § 4-21-101, *et seq.* ("THRA") on December 19, 2011. On January 13, 2012, her attorney filed a complaint in this Court against the Defendant asserting violation of Title VII (Case No. 12-2026). The state matter was removed on January 18, 2012 (Case No. 12-1016). All three cases have been consolidated under Case No. 11-1052. An amended complaint was filed in the consolidated case on April 13, 2012, alleging discrimination pursuant to Title VII and retaliation in violation of Title VII and the THRA. Before the Court are the parties' cross-motions for motion for summary

judgment. The Defendant's motion (D.E. 87) seeks dismissal of all claims,.and the Plaintiff's motion (D.E. 46) requests summary disposition as to the federal and state retaliation claims contained in counts II and III of the amended complaint.

*STANDARD OF REVIEW*

The instant motions are governed by Rule 56 of the Federal Rules of Civil Procedure, which provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To survive summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Pucci v. Nineteenth Dist. Ct., 628 F.3d 752, 759-60 (6th Cir. 2010) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)) (internal quotation marks omitted). "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party." Id. at 759 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 748 (6th Cir. 2012) (quoting Anderson, 477 U.S. at 255, 106 S. Ct. 2505). "Entry of summary judgment is appropriate against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." In re Morris, 260 F.3d 654, 665 (6th Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)) (internal quotation marks omitted). "When parties submit cross-motions for summary judgment on the same claim or issues, each motion must be considered on its own merits and

analyzed under Rule 56." Melchizedek v. Holt, 792 F. Supp. 2d 1042, 1049 (D. Ariz. 2011).

*FACTS*

The following facts relevant to the Court's determination of the instant motions are undisputed unless otherwise noted. Plaintiff, a black female over the age of forty who identifies herself as a Christian, began working for the Defendant as a licensed practical nurse ("LPN") on or about February 29, 2008, performing caregiving services in the homes of Maxim's patients who could not otherwise care for themselves. (D.E. 87-5 at 3, 9, 87-2 at 4-5.)

In October 2009, she received a verbal warning for failing to properly chart physician's orders. (D.E. 87-6 at 17.) According to Plaintiff, she received the warning because a co-worker named Katrina Shipp, a fifty-one-year-old black female, lied to management concerning her job performance. (D.E. 87-4 at 21, 87-5 at 3.) Simns was given a separation notice, but was reinstated the next day. (Id. at 22-23.)

Plaintiff sustained injuries to her legs resulting from a fall at work on December 3, 2009. (D.E. 87-2 at 22-25.) She sought medical treatment at a walk-in clinic that took x-rays and provided her with a knee brace. (Id. at 28.) The Plaintiff then began receiving treatment from Dr. Vincent Kent at Dyersburg Orthopedics in Dyersburg, Tennessee on or about April 13, 2010. (Id. at 31-33.) At that time she was in pain and could not perform her job functions. (Id. at 34.) When Simns next saw Dr. Kent on May 26, 2010, she had seen no significant progress in her condition. (Id. at 35-37.) A third examination was conducted on June 30, 2010, at which she again reported pain. (Id. at 39-40.) In the record are documents stamped with Dr. Kent's signature reflecting that Simns was

released to returned to work as of June 11, 2010.¹ (D.E. 66-1 at 1, 63-1 at 36.) The Plaintiff did not return to any type of work after her December 2009 injury. (D.E. 87-3 at 10.)

Simns completed and signed an Equal Employment Opportunity Commission (EEOC) intake questionnaire on April 15, 2010. (D.E. 87-6 at 18-21.) The document was filed on June 10, 2010. (Id.) A charge of discrimination against Maxim was signed by Plaintiff on June 22, 2010 and filed with the agency eight days later. (D.E. 63-1 at 43.) Defendant claims it received a notice of charge of discrimination, dated June 17, 2010, on June 21, 2010. (D.E. 87-11 ¶ 5.) Maxim received a second notice of charge of discrimination on July 6, 2010. (Id. ¶ 8.) The EEOC issued a notice of right to sue on November 30, 2010. (D.E. 1-1 at 1.)

In an unemployment hearing before the Tennessee Department of Labor and Workforce Development conducted by telephone on December 20, 2010,² Eric Hendrick, Maxim's accounts manager, appeared as the employer's representative. (D.E. 44-6 at 3-4.) The subject of the hearing was an appeal from a November 2, 2010 agency decision denying Simns' claim for benefits on grounds she "failed to provide medical documentation to show that she ha[d] been released with restrictions to perform her work." (Id. at 5.) Hendrick provided the following testimony to the

---

¹One of these documents is on Dyersburg Orthopedics letterhead and is undated. (D.E. 66-1 at 1.) The other is on the letterhead of StatCare, a medical management company located in Linthicum, Maryland, and dated August 25, 2010. (D.E. 63-1 at 36.)

²The Defendant argues in its surreply to Simns' motion for summary judgment that the copy of the hearing testimony attached to her pleadings is unauthenticated and, therefore, inadmissible. However, both parties have cited to the transcript and the Court will consider it here, as it assumes the document will be presented in admissible form at trial. See Satawa v. Macomb Cnty. Rd. Comm'n, 689 F.3d 506, 513 n.7 (6th Cir. 2012) (observing without objection that district court, after noting transcript was likely inadmissible at the time of summary judgment briefing because it had not been properly authenticated, considered the transcript on assumption parties would reduce it to admissible form at trial).

4

administrative law judge (ALJ) under oath:

> . . . I got documentation here that, you know, on 12-3 of 2009 she was injured on the job. We sent her to a doctor to get released back to work. You know, after that she never did provide a full medical release back to work. So we even tried contacting her to see if she could come back because, you know, we did need her for this case, but, you know, we ended up filling it with another nurse, and over time, you know, we just kind of forgot about it, to be honest with you. It was so long before we ever heard back from her.
>
> So, yeah, about mid -- this year, by June or so, we did receive a full letter of release back to work, but that was also accompanied by a suit of discrimination based on race and her sex and religion which we had to go through also. We were advised by our legal team not to hire her back to work for that reason, because she was trying to sue us for discrimination. And also because so much time had passed. You know, in the health care field there's lots of things like CPR cards, nursing license, continuing education credits, things like that has to be constantly updated. Her file was so out of date, you know, she just couldn't return to work at that time.
>
> The suit of discrimination was thrown out by the EEOC. They said there was no discrimination they could find there. That is pretty much what happened. We never received a full medical release back to work after the incident had happened, after multiple attempts to get --

(D.E. 44-6 at 5, 12-13.) This testimony prompted the following exchange between Hendrick and the ALJ:

> ALJ: I thought you said you had received a full release to return to work in June?
>
> HENDRICK: Yes
>
> ALJ: Okay. And you made a decision at that time not to return her to work?
>
> HENDRICK: Yeah, the legal team said not to because she was trying to sue us, basically, for discrimination. And plus she had not complied with, you know, keeping her file up to date between December and June. In health care there are a lot of different requirements that have to be met, you know, constantly each month. There is continuing education, licenses and things that have to be kept up to date, and she didn't do that. TB tests, a lot of things.
>
>        \*   \*   \*
>
> ALJ: The testimony is that she never did contact you as the employer to reapply for

> work?
>
> HENDRICK; Yes, sir, she never called us personally.
>
> \* \* \*
>
> HENDRICK: . . . we did try calling her immediately after the workers' comp incident in December of last year. We couldn't get a hold of her. We couldn't get any return calls back. So, you know, I don't feel that we should have kept calling her at the beginning in the first and second half of this year to continually try to get her to come in when, you know, the end of last year we couldn't get a hold of her and never did receive a notice back to work. So that's the situation there.

(Id. at 13-17.) According to Simns, she telephoned Maxim to advise of the release and spoke with recruiting officer Matt Curtis. (Id. at 15-16.) It is undisputed that, at the time of the unemployment hearing, Plaintiff in fact had no lawsuits pending against her employer and her EEOC charge had been dismissed. (D.E. 90-1 at 11.) On February 15, 2011, Plaintiff filed a second discrimination charge with the EEOC alleging Maxim terminated her employment because of a "pending lawsuit."

*APPLICABLE LAW AND ANALYSIS OF CLAIMS*

Age Discrimination.

The Plaintiff alleges in her amended complaint that she suffered discrimination as "a person of age." (D.E. 44 ¶ 3.2.) The Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"), makes it unlawful for an employer to "discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a)(1). Maxim contends that the ADEA claim is untimely. As noted above, Simns filed a charge of discrimination with the EEOC on June 30, 2010 alleging, among other things, discrimination on the basis of age. (D.E. 44-1 at 1.) A right-to-sue letter was issued by the agency on November 30, 2010. (D.E. 44-2 at 1.) Once the EEOC dismisses a charge and issues a right-to-sue letter, the plaintiff has ninety

days in which to file a civil action in federal court. 29 U.S.C. § 626(e). The Plaintiff's *pro se* complaint did not contain a claim for age discrimination. Instead, age discrimination was first alleged in a judicial proceeding in the amended complaint filed April 13, 2012, more than sixteen months after issuance of the right-to-sue letter.

In response, Simns points out that the EEOC's notice of charge of discrimination, a copy of which was attached to the *pro se* complaint, reflected an allegation of age discrimination. However, in the Court's view, the issue here is not one of exhaustion of administrative remedies where the question is whether the employer was put on notice of a charge of age discrimination made to the EEOC. When a right-to-sue letter is issued, the claimant is free to file suit in federal court on any claim raised in the EEOC charge, or that could reasonably be expected to grow out of the charge, within the ninety-day time period. By the same token, she is free to choose not to sue on any or all of those claims. To the extent Plaintiff is suggesting that the mere attachment of a right-to-sue letter reflecting a charge of discrimination is sufficient to assert a claim on that charge in federal court, the Court is unpersuaded. A decision from this district is instructive. In <u>Reynolds v. Solectron Global Services</u>, 358 F. Supp. 2d 688 (W.D. Tenn. 2005), the EEOC issued a right-to-sue letter to the plaintiff on May 28, 2003 regarding a charge of gender discrimination. <u>Reynolds</u>, 358 F. Supp. 2d at 690. The plaintiff filed suit in federal court on August 22, 2003 alleging only race and color discrimination and attaching to his complaint the right-to-sue letter for gender discrimination. <u>Id.</u> at 690-91. The defendant moved to dismiss on grounds that the court lacked subject matter jurisdiction because the charge alleged only gender discrimination while the complaint asserted only race and color discrimination. <u>Id.</u> On November 20, 2003, the plaintiff filed a second EEOC charge alleging race and color discrimination and on December 23, 2003, after receiving a second right-to-

7

sue letter on the race and color charge, amended his complaint to add a claim for gender discrimination. Id. at 691. The defendant sought dismissal, arguing that the ninety-day period in which to file a suit on the gender discrimination claim had expired by the time the amended complaint was filed. Id. at 693. The court agreed, recognizing that "[o]nce the EEOC has issued a decision and a claimant has received notice of the decision, the claimant has ninety days to file a lawsuit. Here, the ninety day time limit had expired before the [a]mended [c]omplaint was filed." Id. This despite the fact that the EEOC charge for gender discrimination was already part of the record. Here too the ninety-day period for filing an age discrimination claim had expired by the time Simns' amended complaint was filed. Nor can Plaintiff's *pro se* status at the time the original complaint was filed save her age discrimination claim from dismissal. The ninety-day period applies to all plaintiffs, even those proceeding *pro se*, and so much as one day's delay is fatal to a claim. Williams v. Sears, Roebuck & Co., 143 F. Supp. 2d 941, 944-45 (W.D. Tenn. 2001). The age discrimination claim is DISMISSED.

Title VII Discrimination.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, [or] sex . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff asserting, as Simns does here, a disparate-treatment claim under Title VII must "prove discriminatory motive or intent." Serrano v. Cintas Corp., 699 F.3d 884, 892 (6th Cir. 2012), *reh'g & reh'g en banc denied* (Jan. 15, 2013). Such motive or intent may be shown through direct or circumstantial evidence. Id. Plaintiff appears to rely on the latter with respect to her discrimination claims. Circumstantial evidence has been defined as "proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that

discrimination occurred." Ondricko v. MGM Grand Detroit, LLC, 689 F.3d 642, 649 (6th Cir. 2012), *reh'g & reh'g en banc denied* (Sept. 20, 2012). The circumstantial evidence showing utilizes the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), as subsequently modified in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Risch v. Royal Oak Police Dep't, 581 F.3d 383, 390 (6th Cir. 2009), *reh'g & reh'g en banc denied* (Nov. 25, 2009). "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the McDonnell Douglas inquiry." Blair v. Henry Filters, Inc., 505 F.3d 517, 524 (6th Cir. 2007), *reh'g & reh'g en banc denied* (Feb. 7, 2008) (overruled on other grounds).

In order to demonstrate a prima facie case of discrimination, a plaintiff must show that "(1) plaintiff is a member of a protected class; (2) plaintiff was qualified for the job; (3) plaintiff suffered an adverse employment decision; and (4) plaintiff was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." Serrano, 699 F.3d at 892-93 (quoting White v. Baxter Healthcare Corp., 533 F.3d 381, 391 (6th Cir. 2008)) (gender); *see also* Tibbs v. Calvary United Methodist Church, ___ F. App'x ___, 2012 WL 5861725, at *6 (6th Cir. 2012) (race); Burdette v. Fed. Express Corp., 367 F. App'x 628, 632 (6th Cir. 2010) (religion). "Once the plaintiff establishes this prima facie case, the burden shifts to the defendant to offer evidence of a legitimate, nondiscriminatory reason for the adverse employment action." Serrano, 699 F.3d at 893 (quoting White, 533 F.3d at 391). "If the defendant succeeds in this task, the burden shifts back to the plaintiff to show that the defendant's proffered reason was not its true reason, but merely a pretext for discrimination." Id. (quoting White, 533 F.3d at 391-92). "Although the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff." Risch, 581 F.3d at 391 (internal quotation marks omitted).

As to the claim of discrimination on the basis of religion, Plaintiff has neither alleged that she was replaced by a non-Christian or that a non-Christian employee received more favorable treatment. Accordingly, her religious discrimination claim is DISMISSED.

Simns stated in her deposition that her gender discrimination claim was based on Maxim's employment of a male, Matt Curtis, in the office while she had to work in the field. (D.E. 90-4 at 52-53.) She has not alleged that she was replaced by a male. Therefore, she must show that she was treated differently than similarly situated persons outside the protected class. Serrano, 699 F.3d at 892-93. To make this showing, "the plaintiff must demonstrate that [she] is similarly-situated to the non-protected employee in all *relevant* respects." Dickens v. Interstate Brands Corp., 384 F. App'x 465, 468 (6th Cir. 2010) (quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998)).

In her response to the dispositive motion, Simns specifically identified Curtis as her sole comparator. "In evaluating a proposed comparator, courts 'should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee.'" Perkins v. Harvey, 368 F. App'x 640, 644 (6th Cir. 2010) (quoting Ercegovich, 154 F.3d at 352). "This means the plaintiff must prove that all of the relevant aspects of [her] employment situation are 'nearly identical' to those of the non-[protected] employees who [she] alleges were treated more favorably." Hatchett v. Health Care & Retirement Corp. of Am., 186 F. App'x 543, 548 (6th Cir. 2006) (some internal quotation marks omitted). "Differences in job title, responsibilities, experience, and work record can be used to determine whether two employees are similarly situated." Id. (citing Leadbetter v. Gilley, 385 F.3d 683, 691 (6th Cir. 2004)). To make

that assessment, the court is to look at factors such as whether they "have dealt with the same supervisor [and] have been subject to the same standards[.]" Martinez v. Cracker Barrel Old Country Store, Inc., ___ F.3d ___, 2013 WL 115587, at *5 (6th Cir. 2013).

Curtis was not employed as an LPN, but was a recruiter, which Plaintiff described as a management position. Indeed, Simns has provided no evidence whatsoever that Curtis had anything in common with her other than being an employee of Maxim. Thus, she has not demonstrated that he was similarly situated. *See* Hatchett, 186 F. App'x at 548, *supra*. Further, she has failed to identify any male LPN who sought and obtained an office position and, thereby, was treated more favorably than she. Based on her failure to establish a prima facie case, her gender discrimination claim fails.[3]

Plaintiff bases her race discrimination claim on Maxim's failure to permit her to work in the office after her injury. She has identified Curtis and three white females -- Kasey, Danielle, and Shipp -- as comparators in support of her claim. As stated above, Curtis is not similarly-situated. Simns related in her deposition that Kasey was an LPN who, in June 2009, was permitted to "go to the office and train for another spot to go to work,"[4] apparently after being removed from a home by either the patient's family or Maxim. (D.E. 90-3 at 16-17, 22-23.) The Plaintiff recalled seeing Kasey in the office one day and being told that she was attempting to "satellite out in the field" by doing flu clinics and would not be returning to work in homes. (Id. at 22, 90-4 at 10.) Plaintiff

---

[3]In light of the Court's conclusion that Simns failed to establish a prima facie case of gender discrimination, it need not address the remainder of the McDonnell Douglas/Burdine analysis with respect to that claim. *See* JAT, Inc. v. Nat'l City Bank of the Midwest, No. 06-11937, 2008 WL 2397657, at *11 (E.D. Mich. June 10, 2008) ("Plaintiffs cannot establish a prima facie case for any of their discrimination claims. Accordingly, it is not necessary for the Court to engage in the remainder of the McDonnell Douglas/Burdine analysis.").

[4]The fact that Kasey was allowed to work in the office provides additional evidence of the lack of merit to Plaintiff's gender discrimination claim.

11

stated that Kasey "came there from someplace or she was hired in and given more hours immediately than me and the other black lady working there and been there for quite a while and she came in with more hours and that cut our hours and she had the other problem." (Id. at 20.)

Simns contends that Kasey's additional hours and the fact that she was given the opportunity to work in flu clinics, something she would have liked to do while she was injured, evidenced Maxim's preferential treatment of Kasey. However, Plaintiff has proffered no evidence to show whether Kasey had the same qualifications as Simns or other black employees or the nature of the circumstances leading up to Kasey's departure from work in homes.

Danielle, who apparently worked in houses in the same capacity as Plaintiff, was terminated and then rehired, as Simns was. (D.E. 90-4 at 10-14.) Thus, it appears she was treated the same as the Plaintiff. Finally, Simns stated in her deposition that Shipp "was treated some kind of way like maybe she desired to be an LPN and she wasn't" and that she "had obligations going on with them that allowed them to favor her over me because I felt she was doing some of their work." (Id. at 6-7.) The vague statements proffered by Plaintiff fall short of providing the Court with sufficient evidence to permit a finding that Shipp was similarly situated. *See* Johnson v. City of Flint, No. 09-11805, 2010 WL 1957208, at *7 n.16 (E.D. Mich. May 13, 2010) (vague conclusory allegations that others were treated differently because they were outside the protected class is insufficient to establish they were similarly situated). As Plaintiff has failed to establish a prima facie showing of race discrimination, summary judgment on that claim is GRANTED.[5]

Retaliation under Title VII and THRA.

Maxim maintains that Plaintiff's Title VII claim for retaliation is untimely for the same reasons mandating dismissal of her ADEA claim. Under Title VII, a plaintiff has ninety days from

---

[5]*See supra* note 3.

12

issuance of a right-to-sue letter by the EEOC in which to initiate a suit in federal court. Kyle-Eiland v. Neff, 408 F. App'x 933, 939 (6th Cir. 2011). Like the age discrimination claim, Simns included a claim of retaliation in her EEOC charge. (*See* D.E. 1-2 at 1.) In her original complaint, however, Simns averred that Defendant "denied plaintiff healthcare, job opportunity, unemployment needs and failed to assist or accommodate, and *terminated . . . due to retaliation statement*." (D.E. 1 at 2 (emphasis added).) Recognizing that "*[p]ro se* complaints are to be held to less stringent standards than formal pleadings drafted by lawyers, and should therefore be liberally construed," Williams v. Curtin, 631 F.3d 380, 383 (6th Cir. 2011) (internal quotation marks omitted), "in determining whether [she] fails to state a claim upon which relief could be granted," Jourdan v. Jabe, 951 F.2d 108, 110 (6th Cir. 1991), the Court finds the Title VII retaliation claim timely pled.

Defendant also contends that Simns' THRA claim for retaliation is time-barred. A civil case brought under the state statute must be filed within one year. Tenn. Code Ann. § 4-21-311(d). "It is well-settled under Tennessee law that an employment discrimination cause of action accrues under the THRA and the statute of limitations begins to run when the employee is given unequivocal notice of the employer's termination decision." Luciano v. Randstad HR Solutions of Del., LP, No. 11-3095-STA, 2012 WL 601803, at *1 (W.D. Tenn. Feb. 22, 2012) (citing Fahrner v. SW Mfg., Inc., 48 S.W.3d 141, 144 (Tenn. 2001)) (internal quotation marks omitted).

According to the Plaintiff's deposition testimony, while she was never provided such "unequivocal notice" of her termination, she was discharged on June 11, 2010 based on Maxim's failure to pay her, respond to her phone calls, or return her to work. Plaintiff asserts in her briefing papers that, while she "perceived" this date to be when she was terminated, Hendrick's unemployment hearing testimony indicates that the true termination date must have been sometime after Maxim received notice of the EEOC charge. Because there is a question of fact as to her

13

discharge date, the Court cannot find at this juncture that the THRA claim was filed outside the statute of limitations period.

The Court now turns to the merits of the Plaintiff's retaliation claims. Title VII prohibits discrimination against an employee "because [s]he has opposed any practice made an unlawful employment practice [under the statute], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" thereunder. 42 U.S.C. § 2000e-3(a). The state statute finds it a discriminatory practice to "[r]etaliate or discriminate in any manner against a person because such person has opposed a practice declared discriminatory [by the THRA] or because such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing." Tenn. Code Ann. § 4-21-301(1).

Suits brought under either statute are to analyzed similarly. *See* Thompson v. City of Memphis, 86 F. App'x 96, 103 (6th Cir. 2004) ("Tennessee courts have concluded that the legislature intended the THRA to be coextensive with federal law and have indicated that they will look to federal case law interpreting Title VII for guidance in enforcing the THRA"). A plaintiff may demonstrate retaliation by "introducing direct evidence of retaliation or by proffering circumstantial evidence that would support an inference of retaliation." Spengler v. Worthington Cylinders, 615 F.3d 481, 491 (6th Cir. 2010), *reh'g & reh'g en banc denied* (Sept. 10, 2010). "Direct evidence is evidence, which if believed, does not require an inference to conclude that unlawful retaliation motivated an employer's action." Id. "Instead, direct evidence requires the conclusion that unlawful retaliation was a motivating factor in the employer's action." Id. (internal quotation marks omitted). At that point, the "burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." Weigel v. Baptist Hosp.

of E. Tenn., 302 F.3d 367, 382 (6th Cir. 2002).

Where direct evidence is not present, courts are to utilize the McDonnell Douglas/Burdine framework in retaliation cases. Tingle v. Arbors at Hilliard, 692 F.3d 523, 529-30 (6th Cir. 2012). In order to establish a prima facie case of retaliation, the plaintiff must show that "(1) [s]he engaged in protected activity; (2) [the employer] knew [plaintiff] exercised [her] civil rights; (3) [the employer] took adverse employment action against [plaintiff]; and (4) there was a causal connection between [plaintiff's] protected activity and the adverse employment action." Wasek v. Arrow Energy Sys., Inc., 682 F.3d 463, 468-69 (6th Cir. 2012). Upon the defendant's showing of a legitimate nondiscriminatory reason for the termination, the plaintiff must "rebut [her] employer's legitimate, nondiscriminatory reason and show pretext by demonstrating that: (1) the employer's stated reason for [taking the action] has no basis in fact, (2) the reason offered for [the action] was not the actual reason . . ., or (3) the reason offered was insufficient to explain the employer's action." Spengler, 615 F.3d at 493 (quoting Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 545 (6th Cir. 2008)) (internal quotation marks omitted). .

Plaintiff relies on direct evidence to support her retaliation claim in the form of Hendrick's testimony in the unemployment hearing. Maxim attacks the evidence on numerous fronts. First, it proffers the affidavit of Hendrick[6] dated September 19, 2012, in which he related that Simns was released to limited duty work a few days after the December 2009 injury and was offered a light duty position at Maxim's Jackson, Tennessee office, which she rejected. (D.E. 87-10 ¶¶ 5-7.) He never heard from her again until December 2010 and no one informed him that she asked to return to work. (Id. ¶¶ 7, 9-10.) With respect to his hearing testimony, Hendrick stated "I realize now, after reading the transcript of the hearing, that I could have been clearer in what I said at the hearing" and

---

[6] Plaintiff has not sought to have the affidavit stricken.

that "[t]he judge in the hearing assumed that Ms. Simns requested that she return to work in June 2010[; t]hat never happened." (Id. ¶¶ 13-14.) He made further representations in his affidavit: to-wit:

> I recall saying that legal had advised me not to rehire Ms. Simns because she was trying to sue us. This was a mistake.
>
> When I learned that Ms. Simns was released to return to work in late-2010, I believe I was talking with someone in the corporate compliance department. Compliance is not legal, but I tend to lump those departments together. I knew we could not return Ms. Simns to work because her file was out of date, but I was confused about who would handle issues associated with her return to work and believed that I should not take any action because I thought the company lawyers were handling some of those issues. I associated that with something I had heard about a lawsuit being thrown out by the EEOC in November because that topic came up in that conversation or another conversation around that time. I never meant to imply that Ms. Simns was not returned to work because of a lawsuit. I simply meant that I believed those were issues for legal or compliance; not for me. I did not know that the way I said things at the hearing would be confusing.
>
> I never spoke directly with anyone from legal about Ms. Simns, and no one in the legal department told me not to bring Ms. Simns back. I mistakenly interpreted in my mind what I had heard from corporate. No one ever told me not to bring Ms. Simns back. I never even had a conversation about brin[g]ing Ms. Simns back to work because I never heard from Ms. Simns or anyone else about her actually returning to work.
>
> \* \* \*
>
> When the judge tried to correct me about a release that was supposedly received in June 2010, I was confused because I did hear about Ms. Simns being released to return to work in the conversation I just mentioned toward the end of 2010. I second-guessed myself and wrongly assumed that the release might have been from June 2010, but I never had any information in or around June 2010 that Ms. Simns had been released to return to work, if that was actually true.
>
> \* \* \*
>
> I was not involved in any decision to return Ms. Simns to work or any decision not to do so. Like I said, no one ever asked me to put Ms. Simns back to work at any time in 2010 or 2011. I do not know if such a decision was ever made.
>
> I was not involved in any decision to terminate Ms. Simns. I do not know if such a decision was ever made.

(Id. ¶¶ 21-23, 26, 28-29.) According to Hendrick, he participated in the hearing "as the manager of the Jackson office." (Id. ¶ 11.)

Defendant argues that, since Hendrick was not a decisionmaker, his testimony cannot be considered direct evidence of retaliatory intent. Indeed, "[i]n assessing the relevancy of a discriminatory remark, [the court is to] look first at the identity of the speaker." Ercegovich, 154 F.3d at 354. Statements made by those who "played a meaningful role in the employment decision" or who "may have influenced the decision" may constitute direct evidence of discrimination. Taylor v. Bd. of Educ. of Memphis City Schs., 240 F.App'x 717, 720 (6th Cir. 2007) (internal quotation marks omitted). Even a non-decisionmaker's statements may be probative where "the speaker holds a management position, the statements are commonplace or made in a relevant context . . . or where other evidence of animus exists." Griffin v. Finkbeiner, 689 F.3d 584, 596 (6th Cir. 2012). Clearly, Hendrick served in a managerial capacity at Maxim. He made the statements under oath as the Defendant's representative at the unemployment hearing. He stated repeatedly during the proceeding that "we" took actions regarding Simns' employment and that "we" made the decision not to return her to work. The statements qualify as direct evidence and, if believed, require no inference for a factfinder to conclude that unlawful retaliation motivated the cessation of Plaintiff's employment relationship with Maxim.

Defendant also asserts that the testimony contains inadmissible hearsay. Hearsay, of course, is defined under the Federal Rules of Evidence as "a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). The Court assumes that the portion of the testimony with which Defendant takes issue is Hendrick's statement that Defendant's legal department advised management to not return Simns to work because she had sued the employer for discrimination. Rule 801(d)(2)(D) excludes from the hearsay those statements

17

"offered against an opposing party and . . . made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]" The alleged statement from in-house corporate counsel concerning legal advice relative to employee retention issues plainly concerned a matter within the scope of its purpose and is, therefore, admissible.

Finally, Maxim argues that the testimony does not further Plaintiff's claim. Specifically, if her termination date was, as she insisted in her deposition, June 10, 2010, there is no record evidence that it or any of its employees were aware of the EEOC charge on that date and, thus, could not have discharged her for filing it. As referred to above, Simns submits in response that June 10, 2010 was merely the date she perceived her employment was terminated and that her employer should not benefit from any confusion she may have had about the correct date, as it was in the better position to know on what date she was actually discharged. Thus, she avers, whether the termination date was June 10, 2010 or sometime thereafter, the hearing testimony constitutes evidence that the adverse action occurred after Maxim received notice of her charge and for that reason. She also points out that, as the EEOC received her intake questionnaire on June 10, 2010, it is conceivable that Maxim could have been contacted by the agency and, thus, made aware a charge had been initiated, on that date.[7]

Even though her assertions focus on direct evidence of retaliation, Simns offers the same argument in support of a prima facie claim based on circumstantial evidence. It is Maxim's position that Plaintiff was unable to perform the essential functions of her job as of her doctor appointments

---

[7]Simns testified in her deposition that she received a telephone call from the EEOC on June 10 or 11, 2010 and that the intake questionnaire contained Hendrick's name and telephone number.

in May and June 2010[8] and that she has in fact failed to show that it ever received any release returning her to work. Defendant proffers this as the reason why Simns' employment ended. However, factual issues exist as to whether this reason was a pretext for termination or, in the case of direct evidence, whether Maxim would have made the same decision absent an impermissible motive. Accordingly, summary judgment for either party is simply not appropriate. In reaching this conclusion, the Court is in no way suggesting that Plaintiff will prevail at trial. That remains to be determined.

## *CONCLUSION*

Based on the foregoing, the Defendant's motion for summary judgment is DENIED as to its Title VII and THRA retaliation claims and GRANTED as to the remainder. Plaintiff's motion for summary judgment is DENIED.

IT IS SO ORDERED this 4th day of February 2013.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[8]The Court has reviewed the supplemental filing made by the Defendant on January 28, 2013.